**Pages 1 – 46**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**BEFORE THE HONORABLE EDWARD M. CHEN**

WILLIAM GRECIA,                          )
                                         )
              Plaintiff,                 )
                                         ) NO. C 14-0775 EMC
  VS.                                    ) NO. C 14-0969 EMC
                                         ) NO. C 14-1220 EMC
VUDU, INC., et al.,                      )
                                         )  San Francisco, California
              Defendants.                )  Friday
                                         )  December 12, 2014
_____) 2:36 p.m.

**TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:          WAWRZYN LLC
                        233 South Wacker Drive
                        84th Floor
                        Chicago, Illinois  60606
                  BY:   MATTHEW WAWRZYN, ESQ.


For Defendant Apple:    KIRKLAND & ELLIS LLP
                        500 North LaSalle Street
                        Chicago, Illinois  60654
                  BY:   JOEL R. MERKIN, ESQ.


Reported by:            BELLE BALL, CSR #8785, RDR, CRR
                        Official Reporter, U.S. District Court


(Appearances continued, next page)

```
APPEARANCES, CONTINUED:

For Defendant Sony:      KILPATRICK TOWNSEND & STOCKTON LLP
                         Two Embarcadero Center
                         Eighth Floor
                         San Francisco, California  94111
                    BY:  HOLLY GAUDREAU, ESQ.

For Defendant VUDU, Inc:
                         WHITE AND CASE, LLP
                         3000 El Camino Real
                         5 Palo Alto Square
                         Ninth Floor
                         Palo Alto, California  94306
                    BY:  ALLEN W. WANG, ESQ.
                         THOMAS CONOR FLYNN, ESQ.
                         BIJAL V. VIKAL, ESQ.



For Defendant Digital Entertainment Content Ecosystem, LLC:
                         ARNOLD & PORTER, LLP
                         555 Twelfth Street
                         Washington, D.C.  20004
                    BY:  MAULIK GIRISH SHAH, ESQ.
                         and
                         ARNOLD & PORTER, LLP
                         Three Embarcadero Center
                         Seventh Floor
                         San Francisco, California  94111-4024
                    BY:  MATTHEW WOLF, ESQ.
```

**FRIDAY, DECEMBER 12, 2014**                              **2:36 P.M.**

                    **P R O C E E D I N G S**

        **THE CLERK:**  Calling Case C-14-1220, Grecia versus VUDU, and then also C-14-0775, Grecia versus Apple, and Sony, Case C-14-0969.

    Counsel, please come to the podium and state your name for the Record.

        **MR. WAWRZYN:**  Good afternoon, Your Honor.  Matthew Wawrzyn for Plaintiff, William Grecia.

        **THE COURT:**  Thank you, Mr. Wawrzyn.

        **MR. WOLF:**  Good afternoon, Your Honor.  Matt Wolf for DECE.

        **THE COURT:**  Thank you, Mr. Wolf.

        **MR. WANG:**  Good afternoon, Your Honor.  Allen Wang for VUDU.  And with me are Thomas Flynn and Bijal Vakil, also for VUDU.

        **THE COURT:**  Good afternoon.

        **MR. MERKIN:**  Good afternoon, Your Honor.  Joel Merkin for Apple.

        **THE COURT:**  Thank you.

        **MS. GAUDREAU:**  Good afternoon, Your Honor.  Holly Gaudreau for Sony.

        **THE COURT:**  All right.  Thank you, Ms. Gaudreau.

    So, let's first address the motion that's before me.  A motion to dismiss the second amended complaint.  And, let me

first address the claim vis-à-vis VUDU.  I guess, you know, given the allegations in the complaint, that VUDU is really sort of the mastermind, and has contracted through the licensing agreement with DECE to perform allegedly the steps that practice the patent.

Why isn't there a direct-infringement claim here?

**MR. WANG:**  Your Honor, for VUDU, there is no direct-infringement claim here because the way that Grecia has conducted the pleading in the second amended complaint does not rise to the level required to sustain a claim for joint infringement.

**THE COURT:**  Well, what's missing?  I mean, there's a specific claim that -- that describes, at least in an overarching fashion, how it is that the -- under the UltraViolet license agreement, that the claim is being practiced here.

**MR. WANG:**  Yes.  Well, the paragraphs in the pleading actually say five different things about this relationship. And the first is that there is a contract between VUDU and DECE.  And that VUDU interacts with DECE's UltraViolet services.  That is Paragraph 19.  And also going through into 20, that VUDU pays fees under the contract.  And then there's a conclusory allegation that this is all done under the direction and control of VUDU.  And that is actually all that is there about the contract.

Now, there are three other paragraphs, 21 through 23, that refer to the steps that are alleged to be performed through this contract.  And, there is actually no allegation of any control by VUDU in those steps.  You will see that it says VUDU requests, receives, and writes information.  And in each one it says "through the coordination services."  But it doesn't say anywhere that DECE is obligated to do anything; it doesn't say that the contract requires any particular way in which these steps are to be performed.

And so, as alleged, really, any party could provide this information, or DECE could have the option to provide it in the way that they see fit.  Which is not the level of direction and control required under a mastermind pleading.

**THE COURT:**  Well, but, there's been a request now to take judicial notice of the UltraViolet license agreement which is referred to in the complaint.  And, I don't know if anybody's contesting VUDU's request for judicial notice of that -- the authenticity of this hundred-page agreement that contains the coordination agreement, et cetera, et cetera.

And when you look at the substance of it, you know, the question in my mind is whether or not, once this licensing agreement is executed, does DECE have any choice but to perform the essential steps that are identified, for instance, in the complaint?

I know there are a lot of details.  And in some ways it's

is interesting, because like any licensing agreement, there are obligations on the licensee towards the licensor, and there are certain obligations and things that the licensee has to perform.  And in some ways, DECE sort of calls certain shots and has certain discretion.  But at the end of the day, they are obligated to perform this essential service, or at least the services that are essential to making the claim.

And if there's no way to avoid that, why isn't that, you know, the classic kind of -- the accused infringer controlling the conduct of an agent to perform all the steps?

**MR. WANG:**  Well, as pled, Your Honor, there's no -- there's no indication that DECE doesn't have any other way of abiding by its requirements under the contract other than to perform the exact infringing steps listed in the patents.

**THE COURT:**  Well, given the materials that I have, can you be specific?  Is there a way that DECE can comply with its obligations under the UltraViolet license agreement, and still not infringe?

**MR. WANG:**  Yes, there is, Your Honor.  In fact, in Grecia's opposition paper to this motion, they called out a passage.  I don't have the exact cite in front of me, but there is a passage from the agreement that states that DECE contracts with a -- I believe the term was "a coordinator."

**THE COURT:**  Uh-huh.

**MR. WANG:**  To provide the coordinator services.

THE COURT: Yep. Neustar? Neustar is the coordinator, right?

MR. WAWRZYN: (Nods head)

MR. WANG: Um, yes. And that the coordinator is the one that actually handles the alleged steps. And not DECE.

THE COURT: Well, but the coordinator, the licensing agreement makes reference to the coordinator in the service agreement, and certainly makes that part and parcel of the whole thing. And in fact, there is an agreement between Neustar, the coordinator and DECE, as I -- I thought there's some kind of -- so I'm not sure that -- I mean, it's part of the agreement, it seems to me. The Exhibit C coordinator services agreement is, as I understood it -- maybe I don't understand it properly -- is one of the things that has to be entered into as part of the UltraViolet licensing agreement.

MR. WANG: Yes. But maybe some -- a little bit of context about the DECE --

THE COURT: Yeah.

MR. WANG: -- might help us here.

THE COURT: Yeah.

MR. WANG: The DECE (Inaudible)

(Reporter interruption)

THE COURT: Speak into the mic also.

MR. WANG: It's a bit of a standard-setting body. And it's composed of a number of different members, all of

which may contribute information, suggestions, et cetera.
Because the goal of DECE is to provide this UltraViolet
technology.  And there are movie studios and online media
distributors that signed up so they can agree on how do this.

And one of the reasons for there to be this body is that,
of course, by their nature, a lot of these members are
actually competitors.  And so, there's actually no -- there's
no provision in those licensing contracts that would require
everyone else to submit to the will of one of those members
for the reasons that -- you know, it wouldn't make that much
sense for UltraViolet's standard which is shared among
everybody to be controlled by just one person such as VUDU.

**THE COURT:**  Well, they may not be controlled, but
they do have -- you know, I don't know if you call it a
protocol or a process or something that's been devised, and a
structure, and -- and there is a licensing scheme.

And I think the critical point is whether or not -- if
you're looking for a sort of joint-infringement situation,
that is when the principal contracts out a part of its
process, if it maintains control, such that the agent is
obligated to -- to perform the steps, and in its essential
components that those steps are under the control and
direction of the principal, that those acts, those steps are
imputable for infringement-analysis purposes.  If there's
sufficient control.

MR. WANG:  Yes.  That's correct --

THE COURT:  And that's why I asked whether there's any way that DECE can perform what it's obligated to do once the licensing agreement is performed, in a way that's within its judgment that's not controlled by VUDU, in a way that would not infringe.

MR. WANG:  Well, I think related to that topic is actually the allegations in Count 2 about the *Ecosystem* specifications, which are also mentioned in the license agreement for which we requested judicial notice.

The *Ecosystem* specifications are not provided to DECE by VUDU.  They're provided from DECE to people who sign on license agreements.  And if the technology that's being accused here is conducted in accordance with those *Ecosystem* specifications, it's unclear to us how VUDU could be said to control anybody to do things, when it's actually following the specifications promulgated by DECE.

THE COURT:  All right.  What's your response that?

MR. WAWRZYN:  The response, Your Honor, is that the control -- as Your Honor is pointing out -- comes from the obligation of DECE to provide the coordinator services, in exchange for fees.  And so, VUDU is paying fees to DECE; so let's say hypothetically VUDU pays those fees for coordinator services.

THE COURT:  Are those fees paid to DECE or are they

paid to Neustar?

**MR. WAWRZYN:** DECE. Under the -- under the license agreement. The form of license agreement.

**THE COURT:** (As read)

"By signing up for any license role other than client implementer, executing licensee..."

Which is VUDU.

"...is also entering into the agreement attached hereto as Exhibit C with the coordinator operator..."

Which is Neustar, right?

**MR. WAWRZYN:** (Nods head)

**THE COURT:** Which is Neustar. Is that right?

**MR. WAWRZYN:** That is -- that is correct. But, that doesn't speak to the fees issue. The royalty payments are paid from VUDU, allegedly, to DECE.

**THE COURT:** So there's no payment directly from VUDU to Neustar, the coordinator -- services coordinator?

**MR. WAWRZYN:** According to the public agreement, no, Your Honor.

**THE COURT:** So it all goes through DECE.

**MR. WAWRZYN:** That is the allegation.

**THE COURT:** What about the argument about standard setting -- that in the final analysis, VUDU doesn't have control over the standards that might be set forth and implemented by DECE?

**MR. WAWRZYN:** I don't understand the argument, Your Honor. It's simply this: DECE is selling a service to VUDU. And, you know, it may require -- as you pointed out, Your Honor, DECE may require that the form of service that VUDU is signing up for and that it will receive will be according to these specifications.

An analogy. McDonald's with a franchisee requires that: If you're entering this relationship, we have specifications how you're going to run this restaurant, according to this relationship. But, what the franchisee is signing up for and paying for in the form of royalty payments is that service.

And so, if -- and back to the hypothetical where VUDU pays for the service but DECE does not deliver, VUDU could bring DECE into court, control them, and make them render the service for which fees have been paid.

**THE COURT:** Well, is there anything that suggests that DECE has discretion as to how to implement its obligations under the licensing agreement? Is there any discretion to do so in a way that would not infringe?

**MR. WAWRZYN:** According to our allegation, no, Your Honor. The coordinator services which DECE is obligated to deliver in exchange for fees, according to the allegation, practiced steps 3, 4, 5, and 6 of the claimed method. Claim 1, just as an example.

And so, that -- that is the crux of the allegation.

THE COURT:  And the coordinator services are embedded or elicited -- are described in the coordinator services agreement, which is incorporated into the licensing agreement.  Correct?

MR. WAWRZYN:  Correct.

THE COURT:  So it is an obligation; it's a contractual obligation.

MR. WAWRZYN:  It's an obligation.

THE COURT:  So the actual steps that perform steps 3, 4, 5, and 6 are in the contract which obligates DECE to perform -- or its subagent, I suppose, if Neustar might be construed as such -- to perform at the behest of VUDU.

MR. WAWRZYN:  That is the legal obligation.

THE COURT:  So, what's -- why doesn't that, at least for pleading purposes, get us past 12(b)(6)?

MR. WANG:  Well, Your Honor, our understanding of the *Ecosystem* specifications -- which again are promulgated by DECE and not determined by VUDU -- is that those are the rules and guidelines that members must follow in order to coordinate with each other regarding UltraViolet.

So if DECE elects to change those *Ecosystem* specifications, which they can do without needing to go back to VUDU to ask for permission or approval, then they could alter the way in which any of those services are provided.

THE COURT:  How could they change it in a way that

would not breach its obligation, its licensing obligations to the licensee, and also not practice, for instance, steps 3, 4, 5 and 6 of the patent?

**MR. WANG:**  Well, Your Honor, I don't have the specific technical details of how such an implementation could be achieved.  But as the claims of the patent only talk about certain transmissions of information, it's -- I believe it would be possible for other information to be transmitted or stored in a different way, such that they don't infringe.

**THE COURT:**  Well, why isn't that an issue for summary judgment?  Or, you know, as we get further down the road, for pleading purposes you're making now an assertion which, number one, has not been demonstrated with any specificity in this context; two, does not appear in the pleading or in the materials that are judicially noticeable.  And, I do think the licensing agreement is subject to judicial notice.

So, it appears to me that they are under -- DECE is under contract to perform the services that would complete the practice of, at least allegedly, all the steps.

At least for purposes of Rule 12, I have a hard time seeing why the complaint as now alleged, the second amended complaint together with the licensing agreement and the agreement it then in turn incorporates, which is the coordinator services agreement, why that's not enough to at least get us to the next stage.

**MR. WANG:**  Well, Your Honor, I think one of the other issues is with respect to the circular allegation that is in Count 1 and Count 2.  Wherein essentially, just to summarize, it seems like Grecia is asking the Court to accept this pleading where Party A induces Party B by providing mandatory specifications that Party B must follow, in accordance with which Party B infringes by directing and controlling Party A.

And, that situation has actually shown up in a similar context in one of the cases that we cited to Your Honor in our opening brief, called *Brandywine*.  And in that case, there was a similar conclusory allegation about direction and control of one party over another.  Of Casio over Verizon.

But actually, in another parallel case that was filed by the same plaintiff, and that was ongoing at the same time, the plaintiff there pled that Verizon was in direction and control of Casio.  And so, that situation, in addition to the conclusory allegations, was not sufficient, and the court there determined that there was no mastermind and no joint infringement.

**THE COURT:**  What is your response?

**MR. WAWRZYN:**  Your Honor, this -- this logical argument, I'll call it, has no foundation in the law.  And I think perhaps VUDU is exploiting the term "mastermind," which -- which connotes almost this evil genius that's in charge of everything.  But, it's simply not the case.  The mastermind is

the party that coordinates the infringement.

And so in this case, according to the second amended complaint, VUDU does that by paying fees in order to practice steps 3 through 6.

**THE COURT:**  Well, they have to do more than coordinate; they have to control, to a certain extent, the steps.

**MR. WAWRZYN:**  And they do control, because back to the hypothetical, VUDU pays DECE to perform steps 3 through 6. It ultimately can control DECE by hailing it into court and suing it, and making DECE perform the service.  Render the service that they paid for.  And so, that is control.

VUDU cites no case, and neither does DECE, in which it's -- it's just per se that the inducer must naturally be the mastermind.  It -- they cite no authority for that principle. And they simply rely on logic.

And I guess, it's -- my point is well put, if you read VUDU's reply in which they seek to carry the day with this point, and they cite no case law.

They say, quote -- and this is on Page 6 of the reply (As read):

"VUDU need only rely on the authority regarding joint infringement and the parameters of a mastermind relationship..."

(Indicating quotation marks)

"...which provides ample support for the logical conclusion that a mastermind is not one that could be induced by the party it directs and controls."

No citation to any legal authority.

**THE COURT:** Well, I mean, the bottom line is this: You can contract the mastermind or principal can contract with an agent, and the agent can say: Well, if you're going to contract with me, you've got to do it my way, you've got to follow my rules, et cetera, et cetera. Which, of course, implies a certain degree of control.

But nonetheless, I don't think that necessarily inherently defeats the notion that at the end, the principal is still contracting with another party to perform the steps in a way that makes it necessary that that agent has no alternative but to perform the steps. They may have some discretion in certain areas, but I'm not sure they're material. Unless there's some demonstration that that agent -- in this case, DECE -- can perform those steps in a way that fulfills its contractual obligations, and yet still retains the discretion to do it in a way that doesn't infringe. In which case, then I don't think there is enough control. It's got to be control over the material aspects.

And in this case, it's been alleged that, you know, DECE has performed under this obligation of the agreement, steps 3, 4, 5 and 6. Now, maybe that will prove not to be true, and it

can be demonstrated at some other point in this case that there are ways that this can be done without infringing upon the patent, in which -- without violating, over which VUDU could not stop it. Could not have any control, and say, "No, I don't want it that way; I want it this way." If it doesn't have the right to do that, then that would break the chain, I think.

But, at least as alleged, it seems to me there's enough here.

**MR. WANG:** Well, Your Honor, ultimately this is a standard arms-length commercial contract. And we fear that allowing the case to proceed forward on these pleadings as they currently stand risks expanding the guidance regarding mastermind situations and joint infringement to include far more contractual arrangements than were originally intended.

**THE COURT:** Well, I'm not relying just on the second amended complaint. I'm also looking at the contract, itself, which is a hundred pages long, together with the exhibit which includes Exhibit C Coordinator Services Agreement, which then sets forth, especially Schedule 2, the description of on-boarding services and things.

I don't know how much of that -- I mean, some of that is, I guess, what you claim infringes, some of the steps?

**MR. WAWRZYN:** Yes.

**THE COURT:** That was your claim? So, if it weren't

for that, maybe one could argue that -- it's a bit conclusory, but now that we've got the agreement, there's something -- there's more detail to look at.  And so, I'm not making a broad statement, generally.  It is a fact-specific holding.  And only in a 12(b)(6) context.  When we get to the next stage, whether it's Rule 56 or something else, we may well have a different situation.  So, that's where I'm at with respect to the direct infringement.

The inducement claim, I think there are some serious problems with that.  First of all, knowledge of the '860 patent -- I'm not sure I understand exactly what the theory is here with respect to that claim of infringement.

I mean, I have the declaration of Mr. Shah.  And, I understand that, you know, Mr. Singer is named as an inventor.  But in terms of the disclosure, the exhibit that has the information disclosed -- disclosure statement that references the '860 patent, that's -- that was prosecuted by the owner of the patent, which is Sony, I believe, right?

**MR. WAWRZYN:**  Yes.

**MR. WOLF:**  Yes.

**THE COURT:**  So how do I impute from that, knowledge by DECE of the '860 patent?  As a first step.  I mean, there are other elements, too.  But, that's one of the things that has to be demonstrated.

**MR. WAWRZYN:**  With the Court's permission, if I could

go to another factual basis of knowledge. And that is providing claim charts to DECE, prior to filing, serving the second amended complaint.

THE COURT: But after the first complaint -- after the case was initiated.

MR. WAWRZYN: Yes. And so, that would be a limitation on damages on Count 2, without question. But it does not prevent the pleading, itself, from carrying the day on the knowledge element.

THE COURT: So, are you relying -- so you're saying with respect to a second amended complaint, that's still deemed pre-litigation knowledge?

MR. WAWRZYN: Correct. Well, no. No, no, no.

THE COURT: I'm not sure I understand.

MR. WAWRZYN: There's case law -- and, I can supplement the Record on this point and cite the cases. But, for pleading purposes, if -- we can plead knowledge through the complaint on the inducement claim. And it is simply a limitation on damages.

THE COURT: Through the complaint. Knowledge as of the point of the complaint?

MR. WAWRZYN: Correct.

THE COURT: In this case, it would be the second amended complaint.

MR. WAWRZYN: Correct. And, if we step back, the

claim charts were provided shortly after serving DECE with the complaint in, I believe, May of this year.  The second amended complaint was then filed, served, in late September of this year.

So, there -- there is even a pre-complaint time period where DECE had the claim charts, surely knew of the '860 method, and even knew in detail what the allegations were, as far as how DECE providing the coordinator services allegedly does infringe the '860 patent.

**THE COURT:**  Well, when was the license agreement entered into here, between DECE and VUDU?

**MR. WAWRZYN:**  We simply don't know, based on the public information available to us.

**THE COURT:**  But it predated the claims chart, right?

**MR. WAWRZYN:**  Yes.

**THE COURT:**  Obviously, because that was alleged in the --

**MR. WAWRZYN:**  Correct.

**THE COURT:**  Okay.  And I know there is a split in the case law regarding -- well, whether you call it post-complaint or pre-complaint, the point is once litigation is started, you know, can you have an inducement claim based on, sort of, information provided?

And, I have kind of a simple-minded question or approach. And that is:  How can you have -- can you have inducement or,

sort of, the act of continuing inducement, let's say after -- you enter into an agreement, but you didn't know about the patent.  You then learn about the patent at that point, and you learn how it likely infringes and all this other stuff.  You get the specific intent necessary at that point.  But you've already entered into the agreement.

How is that the inducement?  That's the most -- you know, the inducement occurred when the agreement was entered into, and now it's after the fact.

Now, I understand that if there's a renewal, there's an option, or it terminates on its own terms and you've got -- now regenerate a new agreement, you could -- one could say there's a new act of inducement.  Notwithstanding your knowledge of the claim chart and everything else, you continue to solicit business and try to regenerate or renew this contractual business relationship.

On the other hand, if it's a 20-year-term licensing agreement that does not give you rights to terminate, you, the inducer, the alleged inducer, and you can't get out of it, I'm not sure how that's inducement.

**MR. WAWRZYN:**  It's a fair point.  And I would say, you know, that we're dealing with a factual inquiry here.  You know, perhaps I should move to the other bases of knowledge, and set aside this -- the claim charts basis.

**MR. WOLF:**  Your Honor, if I may, before we get to

that?

THE COURT:  Yeah.

MR. WOLF:  You've identified a threshold issue. Obviously, the second part of our motion was going to the specific-intent component of inducement.  But Your Honor focused on the word "inducement."

In the first part of the hearing today as to Count 1, Your Honor found that they had pled adequately -- or at least was leaning towards, I don't know the status of it -- that they -- that VUDU was -- was alleged sufficiently to be a mastermind (Indicating quotation marks).  Not a criminal mastermind, but just a mastermind under the law.

How can it be the case, then, that my client, DECE, induced the party that is the mastermind?  "Induced" means you, but for -- I encouraged you to do something.  We just found that there was sufficient allegations that you were controlling me.  So, this is the fundamental inconsistency. This is a bit --

THE COURT:  I'm not sure it is that inconsistent.  I know it's not your typical paradigm situation, but I don't see why somebody who's got a -- I've got this great process.  If you use me to complete B -- you got the A, you use me to complete B, and I'll do it for like three bucks or something, and it's going to be great.  Once I sell it to you, you're the one -- you call the shots, but you just use this thing.  This

module.

MR. WOLF:  Your Honor, you're absolutely right, if the process and the claims were coextensive.  Recognize, Your Honor, here, the allegation is that Party A does some steps, and Party B does other steps.  And so, I may be inducing him to use us for Steps C, D and E of the claim.  But I'm not inducing him to infringe the claim.  Because Party A, VUDU, is alleged to perform A and B.  So Your Honor's hypothetical is right, unusual but right, if there's co-extensiveness.

But in this case, when the most we could be alleged to be doing is inducing a part of the claim, I'm aware of no law, whatsoever, that says you can be liable for inducing someone to do two out of four or three out of five, or even nine out of ten steps.

THE COURT:  Is there a law to the contrary?  That the inducer provides Steps 3, 4, and 5, cannot induce its partner to do Steps 1, 2, and 3 by saying:  Look, you can make a lot of money if you put your 1, 2 and 3 together with my 3, 4, 5, you're going to do great.  Even though I know this is going to violate a patent, or infringe on a patent, I think it's a great idea and I'm going to sell you 3, 4, and 5, on a really good basis.

MR. WOLF:  If that's the claim, if the -- that's the inconsistency between Counts 1 and 2.  If I'm saying:  Do 3, 4

and 5, and by the way, also doing 1 and 2, then by definition, his client (Indicating) isn't the mastermind.  Because I'm the one that's telling him what to do.  I'm the one that's orchestrating this symphony.  All right?

But what we've just found here is -- Your Honor suggested that there's allegations of the other direction.  And if that's the case, then my client can't be inducing anyone to infringe a claim, because the most we're doing is dealing with a few aspects of it.  We can't be simultaneously controlled and the controller.  Unless you break it down claim -- limitation by limitation.  And that's what the Supreme Court said you couldn't do, when it got rid of the joint infringement.

You have one mastermind.  If you have two masterminds, then there's none.  If there are two, then there are none; then you're just arguing joint infringement through the back door what the Supreme Court said you can't do through the front.

MR. WAWRZYN:  May I respond to that, Your Honor?

THE COURT:  Yeah.

MR. WAWRZYN:  It's -- it's just simply not accurate to say that VUDU is performing some steps, and DECE is performing the remainder of the steps.

An accurate statement would be that VUDU is, itself, performing Steps 1 and 2.  And Steps 3 through 6, it enters a

contract with DECE, who performs the service on behalf of VUDU. And so you have one party, VUDU, performing Steps 1 through 6.

MR. WOLF: But there is no allegation, Your Honor, whatsoever, that DECE induced, asked, urged VUDU to do this. To the contrary. We are told that we are bound by what VUDU wants. That's the inconsistency, Your Honor. Once you break up the steps, you can't have it both ways.

Now, we, as a matter, think you can't have it either way. But you certainly can't have it both.

THE COURT: Well, let me go back to my -- you know, I think there are several issues. But the first one, we don't get very far if you can't even establish sufficient knowledge of the '860 patent to satisfy the specific-intent state of mind. And, I'm having trouble seeing it.

In your papers you rely on the information disclosure statement in a patent that was prosecuted, I guess assigned at some point to Sony. I know Sony allegedly, I guess, is a member of DECE.

MR. WAWRZYN: Founding member.

THE COURT: But, so what? Does that mean everything that Sony knows is imputable to the membership?

MR. WAWRZYN: Here's the allegation: And that is that DECE or someone acting on DECE's behalf prosecuted a patent and disclosed the '860 patent to the PTO.

**THE COURT:**  So, what is the evidence that the prosecution of the patent that is the subject of Exhibit B, the information disclosure statement, was done at -- on behalf of DECE?

**MR. WAWRZYN:**  Okay.  And just to start, we're talking about evidence now, which, it is our burden to collect that.

But based on our pre-complaint investigation, the evidence is that the inventor of the patent that was being prosecuted for which the '860 patent was disclosed to the PTO, the inventor is a gentleman named Mitch Singer, who was a Sony executive.  And based on our information, is presently the president of DECE.

**THE COURT:**  But how does that make the prosecution of this application, No. 13,436,567, back in 2012, just because he was the inventor -- and his name, by the way, doesn't appear on any of the prosecution papers, other than as the inventor, because he may have assigned his rights -- I have no idea what his role is.

But, how was that done on behalf of DECE, if, again, this is a patent prosecuted by Sony?  And, he happened to be the inventor.  I understand there's some overlap, and Sony may have been the founding member.

But this act, this act that has judicial significance of disclosing the '860 patent was done in the prosecution of a patent that was not owned or prosecuted by DECE.

**MR. WAWRZYN:** To become a member of DECE, one must agree to pool patent rights. And so, the allegation -- and, and I can't emphasize it enough: We're just at the pleading stage. The allegation is -- is that this patent -- the Sony patent, let's call it -- is subject to the pool of rights to any DECE member.

And so when you take that fact, you take the fact that Mr. Singer was the inventor, and -- and you also take the fact that pre-complaint, I believe 2010, perhaps 2011, but the correspondence referenced in the complaint is correspondence in which, you know, Mr. Singer is copied, the president of DECE. And DECE invites Mr. Grecia or his company to become a member of DECE.

You take all these things together, and we think that the -- the Sony patent makes out knowledge of the '860 patent.

**THE COURT:** I guess I'm still -- you're saying that under the licensing agreement when you join DECE -- is it through the licensing agreement or through some other agreement that you say there's a pooling of patents?

**MR. WAWRZYN:** It's in the form of licensing agreement. So, for example, the VUDU-DECE agreement would come with an obligation that one pool its patent rights.

**THE COURT:** Well, there's an agreement not to assert patent rights. Isn't it?

**MR. WOLF:** That's right, Your Honor.

**THE COURT:**  Not necessarily pooling.  They have no property rights, no legal rights.  There's an agreement not to assert against any other member (Reading) any such licensees, entities, necessary claims solely for making, having made or using in implementation of the *Ecosystem* specifications internally for evaluation purposes, et cetera, et cetera.

But I don't see a pooling of rights, in -- in, at least, the common sense of that word.

**MR. WAWRZYN:**  And, perhaps that's not the word to use.  But the point in the verbiage that Your Honor just read is our point, itself.  I mean, you, as a DECE member, obtain the benefit, at least defensively, of not -- of practicing the steps in this Sony patent.  For which the inventor, Mr. Singer, cited the '860 patent.

**THE COURT:**  I -- I just -- I don't see any case law that suggests in this kind of situation that you can impute knowledge to DECE because Sony, a member or founding member in its individual business efforts, had prosecuted a patent, and in that, an agent for Sony cited the '860 patent as prior art.  That's, like, four steps removed.

**MR. WAWRZYN:**  Okay.  Let me emphasize that -- I mean, it is our burden to make allegations.

And based on our pre-complaint investigation, we think this is among the pieces of evidence that we will be able to collect and prove that as -- as a legal matter, and as a

factual matter, DECE or one acting on its behalf cited the '860 patent to the PTO.

And so, at the pleading stage, perhaps there is no law on this precise example that as a legal matter alone, the -- the disclosure of the '860 patent in the Sony patent case equals knowledge.  But we believe that the quantum of facts that we have in hand before we file the complaint would establish knowledge.

**THE COURT:**  All right.

**MR. WOLF:**  Your Honor, I don't believe that's the case.  I just -- I don't wish to snatch defeat from the jaws of victory by commenting further.

**THE COURT:**  All right.  Well, I find that enough has been alleged with respect to VUDU.  I understand there is some issues --

**MR. WANG:**  But Your Honor, may I speak for VUDU, to just direct your attention to one more piece of information?

**THE COURT:**  Yes.

**MR. WANG:**  And I believe you have a copy of the license agreement for which we requested judicial notice, but if you don't --

**THE COURT:**  I have it.

**MR. WANG:**  Okay.  If you do, on Page 8, specifically under Section 1.2.2, at the bottom of the page, written into the agreement --

THE COURT:  Wait a minute.  Page 8?

MR. WANG:  8 of 100, but at the bottom it says "Page 2."

THE COURT:  Oh.  Okay.  Yes.

MR. WANG:  At the bottom, Section 1.2.2 is entitled: "Changes to the *Ecosystem* Specifications and Compliance Rules."  And explicitly says in first sentence that (As read):

"Those specifications and rules may be amended from time to time by DECE."

And so, that just shows the kind of discretion that DECE is permitted with respect to these *Ecosystem* specifications. And of course, in the pleadings Grecia has said in Count 2 that those *Ecosystem* specifications are materially relevant to the patent-in-suit.

THE COURT:  Well, can you -- can you give me an example of how they might be amended in a way that would avoid practicing the third, fourth, fifth and sixth steps?

MR. WANG:  Well, Your Honor, instead of, for example, writing into the meta data step -- which is the last step, I believe it would be 6 -- there could be other things.  Instead of -- they could keep a database of device access.  There could be a free-for-all subscription model where you don't have to write any sort of metadata because once you're in, you have access to everything.

There's a huge variety of changes that could be made.

Because, the goal of this agreement is not to handle specifically the digital-rights management in the way set forth in the patent, of course.  It's to give media to consumers.

And so, any way under the sky of doing that would be a potential change to *Ecosystem* specifications that DECE could set forth.  And alternatively, they could remove the authentication requirements, and rely on other aspects such as the IOS or Android built-in security permissions.

THE COURT:  I mean, if you look at the coordinator services agreement, that is, I think, incorporated, one of the things that the coordinator service -- or service coordinator is supposed to do is generate and return SAML metadata, XML to licensee.  So it sounds like it has something to do with the sixth step.

I'm not purporting to understand all this, but -- it's not clear to me -- I mean, maybe you're right.  But again, for pleading purposes, until -- unless it's demonstrated, based on the pleadings and things that I can take judicial notice of, if there's enough room to roam that within the discretion of DECE to fulfill its obligations under this licensing agreement in a way that doesn't run into infringement problems with respect to claim 1, seems to me that there's enough been alleged here.

And that's why I say it may be that you can prove your

point that perhaps this can be done consistent with the coordination agreement and everything else, you can avoid the writing of metadata or some authentication process that's -- verification process that's different, I -- but you know, I could -- that would be the subject of another motion, seems to me.

MR. WANG:  Well, Your Honor, with respect to the coordinator agreement on Page 4, which is Page 10 of 100 in that document, under the 1.5 Coordinator Services section, the second-to-last line in that section states explicitly that (As read):

"The coordinator agreement is solely between licensee and the coordinator operator, and DECE shall have no obligation or liability in connection therewith."

THE COURT:  Yeah, but 1.5 also says:

"By signing up for any licensing role, executing licensee is hereby entering into the agreement attached hereto as Exhibit C."

MR. WANG:  Yes.

THE COURT:  So it's saying you've got do it, if you're going to enter this thing.

MR. WANG:  Well, the licensee has to do it, yes.  So, VUDU has to do it.  Right.

THE COURT:  In any event --

MR. WANG:  Not DECE.

**THE COURT:**  I suspect there's more to be said on this, but in terms of 12(b)(6), I'm going to overrule or deny the motion to dismiss.  But with respect to the inducement claim as against DECE, I'm going to grant the motion.

And I don't see at this point any basis -- we're already at the second amended complaint at this point, and I'm not going to just allow a free leave to amend.  I will leave the door open, if, through discovery, more is found or something is found that would suggest, you know, that the elements of inducement are met.

But I think as pled, even with the inferences that are reasonably drawn in favor of the pleader, I don't think the element -- certainly, for instance, in the first instance of knowledge of the '860 patent, is filled.  I understand that you have a theory, but I just don't think that -- and the facts don't seem to be in dispute at this point.

But, I don't see any authority for imputing knowledge that is so removed from the organization basically to say that in the course of prosecuting a patent that is being prosecuted by a member organization, not its own patent, but a piece of prior art as cited in a disclosure statement to the PTO in aid of prosecution of its patent, that that knowledge, which is signed by some agent of Sony, is then imputed to Sony, and then imputed thereby to DECE.  I just don't find any authority that allows that.  So, so, I think at this point the pleadings

are set.

**MR. WAWRZYN:** One quick, very quick point, Your Honor. And that is that with respect to the claim charts and whether or not those can be support for the knowledge element, that never came up in the briefing. Your Honor gave his indication of -- you know, that being problematic, and Your Honor acknowledged that the case law is split.

I would ask that we be allowed to file supplemental briefing on that issue, to -- you know. And it is our position that this would simply be a limitation on our damages case. That is, the timing of when the knowledge element is established.

So, that's our position, and that is our request.

**THE COURT:** Well, here's the legal question. I think under the facts as I understand them to be, based on the licensing agreement which obviously was entered into in advance of the provision of the claims chart in the second amended complaint, which appears to give VUDU certain termination rights, but not DECE, the right to terminate by DECE are somewhat limited. They have to be based on, for instance, termination for breach, under avoidance of legal liability or cessation of business, you know, bankruptcy of the licensee, et cetera, some other things. But there's no unilateral right to terminate on, for instance, 30- or 60-day notice.

And I'm not sure what the term is, but I don't think -- whatever it is, it doesn't appear to me the term has run. We're still in the initial term.

And so my point -- you would have to find authority that says:  Even when there is no additional activity and the alleged inducer is contractually bound, and doesn't do anything more, that -- somehow, that that can be deemed inducement if it acquires knowledge in the course of its performance of its contractually-obligated duties, that that's still inducement.

**MR. WAWRZYN:**  And our point would be this:  That we -- we've -- DECE acquired knowledge in May of 2014.

Let's say hypothetically that the contract runs, and DECE has no termination rights until 2017.  But in 2014, DECE learned:  We have to stop doing this, or we'll be liable for patent infringement.

And so, that's why I'm saying perhaps it would affect Mr. Grecia's damages case, but we cross the threshold of pleading knowledge.  And it's something that the facts will bear out, and the law will bear it out, once we figure out what's actually going on.

**THE COURT:**  All right.

**MR. WOLF:**  Your Honor, your point is absolutely right.  If they want to split supplemental briefing to try to make this point, we'll respond to it.  But, Your Honor's

absolutely right.

How can we induce something that's already occurred prior to the knowledge?  We didn't induce -- we're not inducing anything right now.

**THE COURT:**  Well, all right.  In the interest of thoroughness, given the magnitude of this case, I'll allow you to, you know, to brief this question.

**MR. WAWRZYN:**  Thank you.

**THE COURT:**  The precise question.  And you can respond.  If you file a brief within the week, let's say seven days from now; and you can file something in response, seven days thereafter.

**MR. WOLF:**  Your Honor, could I just ask for a little bit longer?  Just because of the holidays.  I think seven days puts us right in the midst of it.  Can we just --

**THE COURT:**  True.

**MR. WOLF:**  Can we say like January 5th or something like that?  I just picked a number out of the air.

(Off-the-Record discussion between the Court and Clerk)

**THE CLERK:**  12th of December.

**THE COURT:**  If you want to file something by the end of next week, and then I take it you're out for the holidays?

**MR. WOLF:**  Yes.  Well, more importantly, my associates are, Your Honor.

**THE COURT:**  The brains behind the operation.

**MR. WOLF:**  The brains and the brawn.

**THE COURT:**  Okay.  For that admission, I'll give you credit.  Say, January 5th.

**MR. WOLF:**  Thank you, Your Honor.

**THE WITNESS:**  We'll assume that there is unavailability of brains and brawn during that period.  And then I'll just take the matter under submission.

**MR. WOLF:**  Your Honor, Mr. Shah will take over for purposes of anything left for DECE, with Your Honor's indulgence?

**THE COURT:**  Yeah.  That's fine.  I just want to now talk about case management.

So, I understand that with respect to DECE, because of this additional briefing, there's a matter sort of still pending.  But, I'm prepared to go forward on the assumption at this point that pleadings are settled, subject to review, which means that VUDU is in and DECE is out.

If that's the case, I don't see why we shouldn't go forward and -- and set forth a consolidated schedule.

I'll take comments from you all.

**MR. WAWRZYN:**  Your Honor, there's -- we submitted a joint case schedule, Apple, Sony and the Plaintiff, last week.  And subsequently, we had a mediation with Apple Wednesday of this week.  And, the parties have agreed to continue and further mediate the case in early February.  And so, we would

ask, Grecia, Apple and Sony, that we slightly alter the agreed schedule.  And, and would also ask that VUDU be included on the same schedule.

THE COURT:  Okay.  Do you have a revised proposed schedule, then?

MR. WAWRZYN:  Yes.  Thanks to counsel for Apple.

(Document handed up to the Court)

(The Court examines document)

THE COURT:  All right.  So you would start the exchange of claim construction in February, and do the prehearing statement in March.

So it sounds like claim construction wouldn't occur until June.

MR. WAWRZYN:  Correct.

THE COURT:  Okay.

MS. GAUDREAU:  Your Honor, if I may, Holly Gaudreau for Sony.

I just wanted to notify the Court that Sony just yesterday filed a petition for IPR on all the claims of the '860 patent.

THE COURT:  Uh-huh.

MS. GAUDREAU:  And based on that filing date, the board would need to institute a decision about whether to review, June 11th.  So, our suggestion as far as the modified schedule that Plaintiff is proposing, we may want to modify it a bit, push it out a bit further in light of the IPR.

Our suggestion would be -- just mention that we have March 20th for the joint claim construction and prehearing statement.

THE COURT:  Uh-huh.

MS. GAUDREAU:  We may want to push that out until June, and then possibly do the -- the claim construction hearing in August.  So we wanted to make that suggestion in light of the IPR.

THE COURT:  All right.  What's everybody else's response to that?

MR. WAWRZYN:  Plaintiff would oppose that.  I mean, a petition has been filed.  Nothing more.  Plaintiff opposes.

THE COURT:  Anybody else?

MS. GAUDREAU:  I'm sorry, Your Honor; I would add that we would intend to seek a stay of the litigation once the petition is -- is instituted for review.

THE COURT:  Not before.

MS. GAUDREAU:  Correct.

MR. VAKIL:  Your Honor, Bijal Vakil on behalf of VUDU.

VUDU is in a unique situation, as the case was filed against us five months later.  So, we would propose the parties go along with Sony's proposal of shifting the dates ever so slightly.

That will also give us an opportunity to have a mediation,

which we haven't fit in the case schedule yet.  And hopefully we can have some good news, and alleviate a lot of the Court's work.

THE COURT:  Left me ask you about mediation.  Has there been -- what -- what is happening with respect to ADR?

MR. WAWRZYN:  Plaintiff has mediated with Sony, unsuccessfully.

THE COURT:  Uh-huh.

MR. WAWRZYN:  Mediated with Apple, and that's being continued.  We're going to have another session.

And we have not -- we have complied with the -- the local rules, ADR rules, with VUDU and DECE, but things have not progressed as far as scheduling the form of ADR.

THE COURT:  All right.  Do you think that's something that can be accomplished, at least initial effort with ADR, within the next, let's say, three months?

MR. WAWRZYN:  As far as Plaintiff is concerned, yes.

MR. VAKIL:  Yes, Your Honor, for VUDU.

THE COURT:  Are you all thinking private mediation? Or what are you thinking?

MR. VAKIL:  I believe the parties have used a court-sponsored mediation, and we would propose the same.

THE COURT:  All right.  Court-sponsored mediation?

MR. VAKIL:  Correct.

MR. WAWRZYN:  Yeah.  A mediator appointed by the

panel.  From the panel of mediators.

**THE COURT:**  Sure.  Why don't I go ahead and get that process going, if you agree, and direct that that be completed within 90 days.

**MR. VAKIL:**  Thank Your Honor.

**MR. WAWRZYN:**  Thank you.

**THE COURT:**  Well, I think the thing to do is, you know, I really don't want to delay and just sort of start afresh with claim construction, prehearing statements, and waiting, because that's in effect like granting a stay, which I'm hesitant to do.

On the other hand, if we've got a decision date in early June, you know, I could see pushing things back, you know, a bit.  But, I am really reluctant to -- I mean, we may even push it back one month, or maybe six weeks, so that you actually file your first construction brief.  By then we'll know whether or not the IPR is going to be instituted or not.  And that's not a long delay; that's maybe a five-week or six-week delay.

That may make some sense because of the expense of everybody investing all their time into the briefing, the tutorial, the claim construction hearing, if in fact we get a strong indication from the PTAB that they are going to do something in a major way.  And I may or may not grant -- I mean, I'm not prejudging that.  So, I'm willing to take your

dates and maybe extend it.

You know, right now you've got your brief due the May 5th. If we add six weeks to that, that'll put it in sort of mid-June. And then we would hear this matter in late July or early August, sounds like.

**MR. WAWRZYN:** (Nods head)

**THE COURT:** So --

(Off-the-Record discussion between the Court and Clerk)

**THE COURT:** And we'll probably need a tutorial, is my guess. So let me do this. I will -- why don't you assume that -- well, let's pick a date now for the claim construction. June 29th plus six is what, August?

**THE CLERK:** So, we have the tutorial in August?

**THE COURT:** Well, the claim construction hearing would be in August. Six weeks plus June 29 gets us to --

**THE CLERK:** We have August 10th.

(Off-the-Record discussion between the Court and Clerk)

**THE CLERK:** August 10th for the tutorial, and then two weeks after for the claim construction?

**THE COURT:** Let's -- a little earlier than that. Let's do the claim construction of -- how about August 17?

**THE CLERK:** August 17, and tutorial on August 3rd.

**THE COURT:** Okay. I'll move the briefing back so that your first brief is -- say June 16th. Or June 15th. And then I'll -- I'll adjust the other ones accordingly. I think

that works out.  So that's the rough time frame we are dealing with.

And so, and I also refer this to court-sponsored mediation to be completed within 90 days.

Do you expect to need to conduct any formal discovery prior to mediation In this case?

**MR. VAKIL:**  Your Honor, from VUDU's perspective, we would request that -- the Plaintiff has entered into past settlement agreements, and we would request production of those.

**THE COURT:**  Have you already issued -- promulgated a request to produce?

**MR. VAKIL:**  We have not, Your Honor.  We will do that.

**THE COURT:**  You can do that informally or --

**MR. WAWRZYN:**  Under the agreements, we need a formal request.  We ask for that.

**THE COURT:**  All right, maybe get that going.  And --

**MR. VAKIL:**  Yes, Your Honor.

**THE COURT:**  And if you need some kind of court order in that regard, let me know.

**MR. VAKIL:**  Thank you, Your Honor.

**THE COURT:**  All right.  And then briefing, as I stated, a week from now Plaintiff can file, and then DECE can file a week after that.  I'll just take it under submission.

I don't think I need any oral argument on that.  And I'll rule on that.

MR. SHAH:  You said January 5th, not the week after?

THE COURT:  I'm sorry; January 5th.  Correct.  Good point.

(Off-the-Record discussion between the Court and Clerk)

THE COURT:  And I don't see any reason not to consolidate the cases, at this point.  So, I will put out an order consolidating the cases as well.  All right?

(Off-the-Record discussion between the Court and Clerk)

THE COURT:  And let's see.  Yeah, between now and the -- well, I don't know if we need a CMC between now and the claim construction hearing.  Might be a good idea.  Maybe, in April, just to check in and see how things are going.

THE CLERK:  April 16 at 10:30.

MR. VAKIL:  Your Honor, I'm sorry; my colleague just reminded me.  I don't mean to throw a wrinkle into all this, but Plaintiff has a case against Amazon in Washington, and there is a Markman scheduled, I believe, in March.

MR. WAWRZYN:  (Nods head)

MR. VAKIL:  Would it benefit the Court to wait for that ruling in order to perhaps save us a lot of work if we were to agree with it?

THE COURT:  Well, your briefing is not due until -- at this point, until June.

MR. VAKIL:  Correct.  We just don't know when the judge in Washington will issue its --

THE COURT:  Oh.  Well, that's why the April 16th date is actually a good date.

MR. VAKIL:  Okay.

THE COURT:  Because by then we can readdress this.  And if it looks like that could be promising -- again, I'm hesitant to delay, unless it's a very slight delay with great benefit to be obtained.

So, I may or may not -- that may or may not influence the course of this.  I think it's time to move this case forward, absent a good reason not to.

So, but I think by April 16th, hopefully we will get some indication or -- so that claim construction is when?  Hearing in Washington?  What is it?

MR. WAWRZYN:  It's in March of next year.  I believe, at the beginning.  Forgive me, but I don't have the date handy.

MR. VAKIL:  Is it the week of the 29th?

MR. WAWRZYN:  That could be right.  I just don't know.

THE COURT:  All right.  Well, I assume I'll hear something more at the April 16th case management conference.  Okay?

MR. WAWRZYN:  Thanks a lot, Your Honor.

**THE COURT:**  Okay, thank you.

**MR. MERKIN:**  Thank you, Your Honor.

**MR. VAKIL:**  Thank you, Your Honor.

**MS. GAUDREAU:**  Thank you, Your Honor.

(Conclusion of Proceedings)

Belle Ball, CSR #8785, CRR, RDR
Official Reporter – U.S. District Court
(415) 373–2529

## CERTIFICATE OF REPORTER

I, BELLE BALL, Official Reporter for the United States Court, Northern District of California, hereby certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/  Belle Ball

Saturday, December 20, 2014

Belle Ball, CSR 8785, CRR, RDR